MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILWAY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 74118.   Promulgated March 20, 1936.

*John L. Erdall, Esq.,* for the petitioner.

*E. C. Algire, Esq.,* and *Lloyd B. Harrison, Esq.,* for the respondent.

178

OPINION.

Murdock: The petitioner's first contention is for "a deduction in the year 1929, on account of the exhaustion of a contract entered into with the Canadian Pacific Railway Company." It argues that the evidence "establishes the value to the petitioner of the Canadian Pacific guaranty as of March 1, 1913." This value is supposed to be shown by the alleged saving to the petitioner resulting from the fact that the bondholders agreed to accept 4 percent interest on the bonds. The argument is, that, but for the guaranty, the petitioner would have had to pay interest at 5 percent instead of at 4 percent, thus the guaranty saved the petitioner 1 percent annually on all bonds outstanding, and, by the petitioner's method of computation, the present worth on March 1, 1913, of the savings to be realized during the next 25 years was $7,370,146.43. On March 1, 1913, $52,293,000 par value of the petitioner's bonds due in 1938 were outstanding. The remaining life of the bonds after 1913 was 25 years. Those bonds were still outstanding during 1929 and that year represented one twenty-fifth of the life of the bonds after March 1, 1913. Therefore, the petitioner would deduct for 1929, one twenty-fifth of the value which it claims for the guaranty on March 1, 1913.

The petitioner's method of finding the present worth as of March 1, 1913, of the anticipated savings is mentioned in its brief. Detailed figures of the computation do not appear but only the following explanation: "The March 1, 1913, value of this total savings at 5% compounded annually (See Table IV—present value, page 124-Kent) was $7,370,146.43." [1] There is no evidence to show that the use of the above table and interest rate would be proper under the circumstances of this case to determine the claimed value. A

---

[1] A value of $8,542,667.16 is claimed in the petition "on a 5% present value basis."

different method might furnish a different result. The Board has no personal knowledge on the subject (*Boggs & Buhl, Inc.* v. *Commissioner*, 34 Fed. (2d) 859) and could not use it if it had. *Uncasville Manufacturing Co.* v. *Commissioner*, 55 Fed. (2d) 893; *American Chemical Paint Co.*, 25 B. T. A. 1208, 1213, and cases there cited. There is at least some question in the present case whether the guaranty provisions were separable from other provisions of the contract and whether the obligations of the petitioner, such as its agreement to exchange traffic and not compete, did not possibly minimize the value to the petitioner of the guaranty provisions. Cf. *Christensen Machine Co.*, 18 B. T. A. 256; *Eitingon-Schild Co.*, 21 B. T. A. 1163, 1181. These are continuing obligations which may be interdependent. The petitioner does not recognize this possibility and has not offered any proof on the point, except the words of the contract. However, there are other and, perhaps, more serious defects in the petitioner's contention.

Four million four hundred and thirty-nine thousand dollars par value of the bonds of the issue here involved were outstanding as straight 5 percent bonds prior to the execution of the contract in 1890. Thereafter at least 85 percent of these were surrendered by the bondholders so that the change in rate and the guaranty could be stamped on them. The petitioner says in its reply brief:

> The evidence is conclusive as to the savings on bonds issued prior to the making of the contract. This evidence appears to be the only competent evidence in respect to the value of the guaranty provision. We submit that inasmuch as there was apparently no change in financial condition of the taxpayer when the later bonds were issued, that the savings in connection with the earlier bonds may properly, under the circumstances, be taken as the basis for determining the savings on the later bonds.

This argument is a poor substitute for some proof of savings and value, if any, which should properly be attributed at some particular time to the guaranty provisions of the contract. The holders of the bonds sold prior to the contract of May 27, 1890, agreed to a reduction of the interest rate on at least 85 percent of those bonds, but the evidence does not show whether or not they did so solely because of the guaranty provisions of the contract. The guaranty probably helped to influence them, but the question is, How much? The petitioner depends upon inference for the answer.

Most of the bonds involved herein were issued at some undisclosed time, or times, after May 27, 1890, and before March 1, 1913. They were sold with the guaranty and the 4 percent interest provisions on them. If the guaranty enabled the petitioner to sell its bonds as essentially 4 percent bonds, when otherwise a higher rate would have been demanded, then certain value attributable to the guaranty and based upon a saving of 1 percent in interest must have come

into existence through and at the time of the sale of the bonds. Such asset value, reduced by exhaustion to March 1, 1913, might form the basis for deductions thereafter. Cf. *Helvering* v. *Union Pacific Railroad Co.*, 293 U. S. 282. However, there is no evidence in the record to show or tending to show the effect of the guaranty upon the sales of the bonds. The financial condition of neither company has been shown. If the condition of the petitioner was relatively strong and that of Canadian Pacific relatively weak when any, or all, of the sales were made, it is possible that the guaranty was of little value to the petitioner, and the fact that it could sell 4 percent bonds instead of 5 percent bonds and thus "save" 1 percent would have to be attributed primarily to its own strength and prospects rather than to the guaranty. If the facts were otherwise, the inferences would, of course, be different. But without some proof of the value or effect of the guaranty at the time when the bonds were sold, how can its value be determined? The petitioner would draw the inference that but for the guaranty the petitioner could have realized the same amount from its bond issue only by increasing the interest rate to 5 percent. But the record does not justify this inference. Perhaps the bonds might have sold at a smaller discount with no guaranty, had they called for interest at 4¾ percent, 4½ percent, or 4¼ percent. Even at 4 percent they might have sold just as well without the guaranty. The exact savings attributable to this guaranty and the value of it are probably difficult to prove. Failure to prove them to a mathematical certainty need not be fatal. *Kentucky Tobacco Products Co.* v. *Lucas*, 5 Fed. (2d) 723. Yet some reasonable proof of the probable savings attributable to it and of the probable value of the contract at some particular time should have been introduced.

The statute allows a deduction on account of depreciation or exhaustion based upon the "fair market value" on March 1, 1913, of the property being exhausted through use in a taxpayer's business. Secs. 23 (k), 114 (a), 113 (b), Revenue Act of 1928. *Huyler's, Inc.*, 24 B. T. A. 425. "Fair market value" has been defined judicially as the price at which property would pass at a given time from a willing seller to a willing buyer, where neither was forced into the transaction. The guaranty in question may not have been valuable or salable on March 1, 1913. The bonds had been sold previously. The petitioner was then obligated to pay interest at 4 percent, and the bondholders could demand no more, except in case of default. In the latter case, the Canadian Pacific was to pay 4 percent to the bondholders and to become entitled to collect its advances with 5 percent interest thereon from the petitioner, or, if the Canadian Pacific defaulted on its guaranty, the bondholders could demand 5 percent from the petitioner. Thus the contract might prevent foreclosure,

provided Canadian Pacific remained able to make good on its guaranty, but it would not save 1 percent on interest in case of default in the payment of 4 percent. The "savings" at that time depended primarily upon the probability of the petitioner meeting its obligation to pay 4 percent in each year. There is no direct evidence of the value of the guaranty at any time. It does not appear whether or not the guaranty was valuable on March 1, 1913. Unjustified inference can not serve as a ground for reversing a determination by the Commissioner and allowing deductions based on alleged values running up into the millions.

The petitioner contends that it abandoned its ore dock, yard and tracks, and its branch line and tracks on the range in 1929, and thereby sustained losses. Each party makes various other claims in regard to the proper treatment of these items which need not be set forth. The figures are not in dispute. The principal questions are whether the facilities were actually abandoned in 1929 and, if so, whether deductible losses resulted. The findings of fact furnish complete answers to all questions raised. A brief discussion of some of the evidence may be appropriate.

The Northern Pacific Railway Co. (hereinafter referred to as Northern Pacific) owned a large modern concrete ore dock in Superior, which was near and accessible to the petitioner's main line. The capacity of this dock was sufficient to handle the ore shipments of both roads. The petitioner's ore dock was in need of improvements and required increasingly expensive repairs. The two companies agreed to a plan in 1928 whereby they would try for one year to handle the ore shipments of both roads over the Northern Pacific dock. The petitioner was to pay rent for the use of the dock. The plan was not successful. However, both companies were of the opinion in 1929 that operating expenses could be reduced by pooling their traffic in ore and coal under a single management so that the one dock and a single set of tracks on the range would suffice for all purposes. They appointed a committee in January 1929, which worked out a plan and prepared a contract.

The contract was executed by the two companies on April 15, 1929. It was for a period of 99 years. It provided for the pooling and the division between the two railroads in stated proportions of the ore and coal transported between Superior and the Cuyuna Range, the pooling of ore cars and other facilities, the movement of the petitioner's ore trains over part of the main line of the Northern Pacific, the joint ownership of the trackage necessary for the movement of pooled tonnage on the Cuyuna Range and the abandonment of such of them as might be found unnecessary after a survey during the operating season of 1929 and for the abandonment of the branch line of the petitioner connecting its main line with the range.

It also provided for the joint use of the Northern Pacific ore dock and ore yards at Superior and certain tracks on the range, for the maintenance during 1929 of such portions of the petitioner's ore dock at Superior as the parties might determine advisable for a reserve until the close of the 1929 season, and for the assumption by the Northern Pacific of 40 percent of the sum of $19,000 expended by the petitioner on the maintenance of its facilities at Superior for the purpose of making them available for use during 1929, and 40 percent of the cost of current running repairs to the petitioner's dock and its approaches while in this temporary use. If they found it necessary to use the petitioner's ore dock during 1929, the parties intended to build an extension to the Northern Pacific dock in the fall of 1929 and abandon the petitioner's dock. The petitioner's ore dock, yard, and line were never used after 1928.

The movement of ore began about April 1, 1929, and at that time the two companies began operating under the pooling provisions of the agreement. Shortly after the agreement was signed they filed a joint application with the Interstate Commerce Commission for approval of the provisions relating to the pooling of ore tonnage, the operation by the petitioner over the line of the Northern Pacific Railway Co., and the joint operation by the two companies of tracks and facilities on the Cuyuna Range. The Commission approved this arrangement on June 3, 1929. The operations up to August 1929 demonstrated to the satisfaction of the petitioner's general superintendent that all ore could be handled over the Northern Pacific dock. He notified the vice president in August 1929 that he was satisfied that the petitioner's ore dock and ore line would no longer be required and recommended that arrangements be made to dismantle them. The petitioner's chief engineer in the fall of 1929 informed his assistant, in charge of the ore dock, that the dock and ore line would be used no longer, and he instructed him to take the necessary steps to dismantle them and recover as much salvage as possible. They were not useful for any other purpose. The assistant found that the material could not be disposed of readily or profitably, but finally, in July 1930, a contract was entered into for dismantling the ore dock, the approach, and part of the ore line, and the actual work of dismantling was begun in August 1930. Shortly after the approval of the pooling agreement by the Interstate Commerce Commission, the general superintendent of each company determined and agreed what part of the tracks and facilities on the Cuyuna Range should be retained in use as jointly owned facilities under the agreement of April 15, 1929, and what part should be abandoned. The tracks which they decided to abandon were not taken up immediately but their use was discontinued. The general superintendent of the petitioner prepared a detailed statement of all the tracks

and facilities which were no longer needed, and recommended to the petitioner that they be abandoned. The petitioner, on July 13, 1929, filed an application with the Interstate Commerce Commission for its permission to abandon the tracks on the range and a part of its branch line leading to the range. The Commission authorized the abandonment by an order dated March 12, 1930. The work of taking up the tracks was begun thereafter.

The Commissioner, in determining the deficiency, has held that the properties in question were abandoned in 1929 but, because the abandonment took place as a result of the agreement of April 15, 1929, the loss should be amortized over the 99-year period of the pooling agreement. This agreement was not a lease. It did not result in the substitution of any assets for those abandoned. The abandonment of the property was not a necessary incident to the acquisition of other property. Thus the unexhausted cost of the assets abandoned should not be treated as cost of the agreement, nor should that cost be amortized over the life of the agreement on any other theory. The case of *Chas. N. Manning*, 7 B. T. A. 286, and other similar cases cited by the respondent apply only where there has been a substitution of assets and are not in point here.

The respondent now contends that there was no abandonment in 1929. This is contrary to his determination as shown in the notice of deficiency and is also contrary to the preponderance of the evidence. Loss for income tax purposes in cases such as this depends upon whether in fact the property became worthless in the taxable year as demonstrated in part by its abandonment. The abandonment is to be determined from all facts and surrounding circumstances. *Belridge Oil Co.*, 11 B. T. A. 127; *Reuben H. Donnelley Corporation*, 26 B. T. A. 107; *Fox River Paper Co.*, 28 B. T. A. 1184, 1200. See also Regulations 74, art. 173. Here there was not only an intention to abandon and a non-user but also an actual abandonment in fact of the facilities in 1929. The properties were not valuable for other purposes except as salvage. The loss actually occurred in 1929. The fact that demolition did not take place until later does not preclude the allowance of the deduction for the year of actual abandonment and loss. *Fraser Brick Co.*, 10 B. T. A. 1252; *Kilby Car & Foundry Co.*, 4 B. T. A. 1294.

The respondent argues that permission of the Interstate Commerce Commission had to be obtained before the branch line and the tracks on the range could be legally abandoned. See pars. 18, 19, 20, sec. 1, Interstate Commerce Act.[2] Apparently permission of the Interstate Commerce Commission was not required in connection with the

[2] These sections provide that no carrier by railroad subject to the act shall abandon any portion of a line of railroad until it shall first have obtained a permit for such abandonment from the Commission. The penalty provided is fine and imprisonment upon conviction.

abandonment of the dock facilities in Superior. See par. 22, sec. 1. Interstate Commerce Act. The act upon which the Commissioner relies is for the purpose of regulating commerce. It provides its own penalties. The "abandonment" referred to therein has no necessary bearing upon the question of loss for income tax purposes. The deduction of a loss for income tax purposes is not withheld by that act until the permission of the Commission has been obtained. Cf. *Old Colony Railroad* v. *Commissioner*, 284 U. S. 552; *Second National Bank of Philadelphia*, 33 B. T. A. 750. The test for tax purposes is a practical one. Furthermore, in this case it appears that the Interstate Commerce Commission had approved the plan in 1929 which included as one of its principal purposes the abandonment of the lines made unnecessary by the pooling agreement, the petitioner made application in 1929 for a permit to abandon the line, and the application, though contested, was granted early in 1930. It is now apparent that the petitioner actually sustained a loss in 1929.

Reviewed by the Board.

*Decision will be entered under Rule 50.*