MINE HILL & SCHUYLKILL HAVEN R. CO. v. SMITH, Collector of Internal Revenue.

Civ. A. No. 7838.

United States District Court
E. D. Pennsylvania.

Jan. 5, 1950.

MacCoy, Brittain, Evans & Lewis, Philadelphia, Pa., for plaintiff.

Gerald A. Gleeson, U. S. Atty., Philadelphia, Pa., for defendant.

KIRKPATRICK, Chief Judge.

Since 1896 the taxpayer's railroad lines have been leased to and operated by the Reading Company (the Railway) under a 999 year lease by which the Railway is bound to maintain the property in good order and repair, to keep it in public use and operate it and, at the termination of the lease, to surrender it in the same good order and condition as when leased. This was all subject to a proviso that, in the case of any line serving a single colliery, the Railway would not be bound to continue to keep that line in good order and repair if the colliery should be abandoned.

One of the taxpayer's branch lines, 2.06 miles long, served a single colliery the working of which had been discontinued long prior to 1943. At least as early as 1931 the Railway ceased to operate and maintain this line and by 1943 it had so deteriorated that its ties were decayed and some of the ties and rails had been removed or stolen.

In 1943, upon application of both lessor and lessee, the Interstate Commerce Commission issued its certificate permitting the Railway to abandon operation of the line in question and the taxpayer to abandon the physical property, after which the line was torn up and sold for what it would bring.

The taxpayer's original investment in the line was $70,324.28 and the salvage was $2,264.06. The difference, or $68,060.22, is

claimed by the taxpayer as a loss in the taxable year 1943.

■■ Before any taxpayer is entitled to the benefit of a deduction for a loss under Section 23 of the Internal Revenue Code, 26 U.S.C.A. § 23, it must show the amount of the loss and that it was sustained in the taxable year for which it is claimed. International Educational Pub. Co. v. Commissioner of Internal Revenue, 5 Cir., 79 F.2d 343. The burden is therefore upon the plaintiff in this case to establish that the loss claimed occurred in 1943, and the amount of it.

■ The taxpayer has made its claim in accordance with Section 29.23(e)-3 of Treasury Regulation 111 which provides: "Loss of Useful Value.—When, through some change in business conditions, the usefulness in the business of some or all of the capital assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis * * * and the salvage value of the property". Under this Regulation, the year in which the loss occurred, for tax purposes, is not necessarily the year in which the property in respect of which it is claimed was sold.

So far as the physical property—rails, ties, switches, etc.—is concerned, it can hardly be disputed that its usefulness in the business of both lessor and lessee ended when the colliery shut down permanently, which was at least 12 years prior to 1943. The taxpayer, conceding as it must in view of the principles stated in Minneapolis, St. Paul & Sault Ste. Marie Railway Company v. Commissioner of Internal Revenue, 34 B.T.A. 177, 185, that, if there had been no lease, it could not in 1943 claim a loss attributable to the abandonment of the colliery, or to the discontinuance of operation and maintenance by the Railway during the years prior to 1943, takes the position, as stated in its brief, that its loss arose "not * * * from the non user of the lines by the lessee, but from the release of the lessee from its covenant to surrender the lines in good order and repair on the termination of the lease" and the lessee, it says, was not released from its covenant until 1943 when the Interstate Commerce Commission gave it permission to abandon operation.

If it be assumed that this is the true nature of the loss, then the amount of it would be measured by the value of the obligation from which the Railway was released. This, however, would not be the amount of the investment less salvage (which was all the taxpayer proved) but the difference between the value of 2.06 miles of perfectly useless railroad in good order and repair and the same 2.06 miles of useless railroad in a bad state of disrepair. The continued repair and maintenance of the line after the abandonment of the colliery, which destroyed its usefulness, could by no possibility have preserved or restored the value of the taxpayer's investment in it. What the taxpayer failed to prove was the value of the line in 1943 had it been kept in good repair, which, since it was merely a line to nowhere, could not have been very much more than the salvage value and certainly nothing like what was originally invested in it.

But, apart from this, even had the amount of loss claimed to have arisen from the release of the Railway's covenant been proved, it is clear that it must have occurred before 1943. The taxpayer's whole case upon the question of the loss-year depends upon the proposition that Section 1 (18) of the Transportation Act of 1920, 49 U.S.C.A. § 1(18), in effect amended the lease so that the Railway could not free itself of its obligation in this respect until it had obtained permission from the Interstate Commerce Commission, as required by that Section, to abandon operation of the line.

The argument does not take into account the fact that the Railway's contractual obligation to the lessor and its obligation to the public, arising from its character as a common carrier, are two entirely different things and that either may be released or continued without affecting the other. Suppose, for example, the colliery had never been abandoned but had remained in full

operation, but the Railway had found it more advantageous to serve it by a line of its own and had obtained permission from the Interstate Commerce Commission to abandon operation of the line leased from the taxpayer. Certainly it would not be argued that it was thereby released from its obligation to keep the leased property in repair. Or suppose again, the colliery not having been abandoned and being in operation, the two companies had agreed that thereafter the taxpayer, not the Railway, would operate and maintain that particular line and the taxpayer had thereupon expressly released the Railway from all obligations of the lease in respect of it. Could the taxpayer, later, hold the Railway for damages for breach of the covenant to repair on the theory, now asserted, that the Transportation Act had so amended the lease as to make the release, without the certificate of the Interstate Commerce Commission, a nullity?

It will be noted that the proviso did not make it obligatory upon the Railway to stop maintaining and repairing the line when the colliery discontinued. If it had, it might be argued that the Transportation Act would have invalidated that provision as illegal and so "amended" the lease in that particular. But all the proviso said in effect was "If a colliery ceases to operate you owe us nothing further by way of repairing and maintaining the line"—an entirely legal agreement unaffected by the Transportation Act of 1920. It may be that in abandoning operation and allowing the line to fall into disrepair the Railway acted unlawfully and it may be that it could have been compelled by the Commission to continue operation and maintenance or have been subjected to penalties for failing to do so; but the law of taxation deals with realities; and the year in which a loss occurred is determined by what actually happened, not by what might have happened had the party occasioning it observed some duty which it owed to the public or to others than the taxpayer. The plain fact is that, lawfully or unlawfully, the Railway did abandon the line when the colliery shut down and that it did it with the taxpayer's previously given consent.

Whatever obligation to the public on the part of the Railway remained, its obligation to the taxpayer to keep the line in repair ended then and there and if any loss was occasioned to the taxpayer from the extinguishment of its contractual right to have the line maintained, the loss occurred at that time.

Judgment may be entered for the defendant.