OFFSHORE OPERATIONS TRUST, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent WALTER S. BAIRD AND MARY D. BAIRD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Offshore Operations Trust v. Commissioner
Docket Nos. 1053-71, 724-72 and 723-72
United States Tax Court
T.C. Memo 1973-212; 1973 Tax Ct. Memo LEXIS 76; 32 T.C.M. (CCH) 985; T.C.M. (RIA) 73212; September 24, 1973, Filed Robert A. Trevisani and Thomas A. Wooters, for the petitioners. F. Patrick Matthews, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION
DAWSON, Judge: In these consolidated cases respondent determined the following deficiencies in petitioners' Federal income taxes: 2 Petitioners
Docket No.
Taxable Year Ended October 31
$0
Offshore Operations Trust
1053-71
1966
$13,814.00
1967
27,886.00
1968
25,204.00
Offshore Operations Trust
724-72
1969
17,047.00
Walter S. Baird and Mary D. Baird
723-72
December 31, 1969
10,859.95
*77 Certain concessions have been made by the parties and will be given effect in the Rule 50 computations. The issues presented for our decision are as follows: 1. Whether Offshore Operations Trust properly allocated its cost basis between the land and building located at 33 University Road, Cambridge, Massachusetts. 2. Whether Offshore Operations used the correct useful life of its building for purposes of computing depreciation deductions for each of the taxable years ended October 31, 1966, through October 31, 1969. 3. Whether Offshore Operations Trust is entitled to an abandonment loss on the building for the taxable year ended October 31, 1969. 4. Whether certain amounts expended in connection with the operation of a yacht, Crows Nest IV, constitute additional income to Walter S. Baird in the taxable year 1969. 3 FINDINGS OF FACT Some of the facts have been stipulated by the parties. The stipulation and supplemental stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. General Offshore Operations Trust, petitioner in docket numbers 1053-71 and 724-72 (herein called Offshore), is a Massachusetts *78 trust with transferable shares taxable as a corporation for Federal income tax purposes. Its principal place of business was in Cambridge, Massachusetts, when it filed its petitions herein. There are three trustees of Offshore although Walter S. Baird was the sole stockholder and beneficiary of Offshore in addition to serving as a trustee. Walter S. Baird and Mary D. Baird, petitioners in docket number 723-72, were husband and wife whose residence was in Lexington, Massachusetts, at the time they filed their petition herein. Offshore filed its Federal income tax returns, using the cash method of accounting, for the four fiscal years at issue with the district director of internal revenue at Boston, Massachusetts. 4 The individual petitioners filed their joint Federal income tax return for 1969 with the district director of internal revenue at Boston, Massachusetts. Dr. Walter S. Baird (herein sometimes called petitioner) started a business in scientific instrumentation in 1936 after receiving his PH.D. degree from Johns Hopkins University. The business, Baird Associates, had grown so much by 1940 that it required further space. Dr. Baird located this space at 33 *79 University Road, found its owner and arranged to rent suitable quarters. In 1956 Baird Associates merged with Atomic Instruments taking the corporate name Baird-Atomic. It is a publicly held company with some 8000 shareholders. Petitioner currently holds approximately 5 percent of the outstanding stock. After serving as president of the company for many years, he is presently the chairman of the board. In 1950, Offshore Operations Trust was formed. It owned a boat that was initially used for various purposes for the United States, such as acting as a target vessel as well as disposing of atomic wastes. The boat was also used for pleasure activities by the petitioners. Thirty-three University Road contains a brick milltype building constructed at the turn of this century. 5 The property contains approximately 51,000 square feet of land. The three story building built thereon contains 84,500 square feet of floor space. The manufacturing operations carried on in the building were done so under a "nonconforming use" zoning exception - the building having predated the zoning laws of Cambridge. The petitioner, an avid sailor, became a close personal friend of Herbert *80 H. White, the owner of the 33 University Road building. In 1940, Mr. White was nearly 70 years of age. He desired that the operating decisions respecting his buildings be handled by petitioner. Baird Associates initially rented 7,500 square feet of space in the building. By 1960, Baird Associates, then renamed Baird-Atomic, was occupying the entire building. Baird-Atomic was managing the building, making any renovations or additions necessitated by the exigencies of its business and making needed repairs to the premises. The cost of capital improvements was deducted from the rent due. On May 16, 1955, Mr. White gave the petitioner an option to purchase the 33 University Road property. The option provided for a purchase price of $300,000 and was exercisable upon Mr. White's death. Shortly after Mr. White died the petitioner exercised the option and took title to 6 the property in January 1964 from the Cambridge Trust Company, trustee of the Herbert H. White Estate. The property was transferred to Offshore on November 2, 1964. The transfer was treated as not being a taxable event. 33 University Road Property This piece of property in Cambridge contains somewhat *81 more than an acre in area. It lies north of the Charles River being separated from the river by a monastery. The monastery, which is of Gothic architectural design, is two stories in height albeit with some higher elevations. To the west lie residential properties. To the north lies two garage-type structures. To the east are the parking and roundhouse facilities of the Massachusetts Bay Transit Authority. These latter facilities were separated from 33 University Road by a 25-foot high brick wall. The area around 33 University Road was heavily congested. Parking and freight access to the manufacturing facilities were difficult for all parties. Arterial highways to the north and south of the property brought traffic to the vicinity of the property. Passage from the major highways to the manufacturing facilities was difficult but not impossible. 7 At the time the petitioner exercised his option to purchase the property it was leased to Baird-Atomic for a period of 10 years ending May 31, 1966. Baird-Atomic purchased the garage located at 130 Mt. Auburn Street from the High-Voltage Engineering Company on August 27, 1957. In order to make available funds for the *82 construction of additional plants Baird-Atomic was interested in selling the Mt. Auburn Street garage throughout the period from 1963 until 1965. Walter Baird thought the Company should relocate because of the zoning variance under which the plant was operated, the inadequate parking facilities for employees and visitors, and the production problems inherent in a multi-story manufacturing operation. Immediately adjacent to 33 University Road, Mr. White owned a garage building - the University Garage. Mr. Gerald Hawkins owned an option to purchase this garage from Mr. White. Following Mr. White's death Hawkins exercised this option. Hawkins simultaneously granted the petitioner a right of first refusal to purchase the garage if Hawkins should desire to sell. In consideration for this option the petitioner provided heat and electrical service to the garage. In 1965 the petitioner assigned this option to Baird-Atomic. On November 13, 1965, Baird-Atomic purchased the University Garage for $250,000 from Hawkins. 8 When Offshore acquired the 33 University Road property Baird-Atomic was the sole tenant. At that time Baird-Atomic occupied the premises under a 10-year lease *83 from White. This lease term ended on May 31, 1966. At the time of initial negotiation the lease called for an annual rental of $67,800. The landlord was to pay all real estate taxes, maintenance and insurance costs. On May 31, 1966, Baird-Atomic and Offshore entered into a new lease for the 33 University Road premises for 1 year at an annual rental of $86,508. Baird-Atomic was obliged to pay the real estate taxes. These taxes amount to $17,701.07 in 1966. The maintenance costs estimated to be $12,000 per year and the liability and property insurance of $1,800 per year were also paid by Baird-Atomic. The assessed value of the 33 University Road property in January 1964 was: Land
$28,000
Building
$124,500
When Offshore acquired the 33 University Road property in January 1964 it did so at a cost of $300,000 which became its basis in the property. At that time petitioner allocated $50,000 to the land and $250,000 to the building. The building was depreciated on the basis of a 25-year useful life. 9 On January 20, 1966, the board of directors of Baird-Atomic voted to purchase land in Bedford, Massachusetts, as a site for a new plant. The *84 estimated time required before a move could take place was at least 18 months. The new plant was occupied September 30, 1969, 3 years and 9 months from the date of the meeting authorizing the purchase. In November 1966, Baird-Atomic and Offshore executed an agreement to sell their adjacent properties as a unit rather than as two or three separate parcels. On October 22, 1968, Baird-Atomic and Offshore entered into separate agreements to sell some of their properties - namely the Mt. Auburn Garage and the University Garage to the Cambridge Plaza Real Estate Trust. Following this sale the 33 University Road property was still held by Offshore. On November 13, 1969, the board of directors of Baird-Atomic voted to sell the 33 University Road property, both land and building, to Cambridge Plaza Trust for $30 per square foot if Baird-Atomic acquired it pursuant to a final decree of the Massachusetts Superior Court within 9 months of such agreement. For 18 months following this, the Cambridge Plaza Trust was to have the right of first refusal on the property. 10 Within its fiscal year ended October 31, 1969, Baird-Atomic vacated the 33 University Road property. After Baird-Atomic's *85 departure, Offshore contacted a large Boston real estate broker to explore the possibility of renting the 33 University Road property. It was Offshore's belief that contact with one large real estate firm would, by means of multiple listing interlocks, effectively bring the availability of the property to the notice of possible tenants. No other tenants ever occupied the 33 University Road property prior to its being demolished. In mid-February 1970, Offshore and the Carlson Corporation entered into a Purchase and Sale Agreement. While these negotiations were underway Offshore simultaneously carried on negotiations for the sale with Cambridge Plaza Real Estate Trust. At the same time Offshore held a $75,000 deposit from the RDA Corporation. This deposit was subsequently returned. On April 16, 1970, title to 33 University Road passed from Offshore to the Carlson Corporation. The property was sold for $1,788,164.50. Appraisal of 33 University Road Property Mr. Paul G. Kinsella, an experienced real estate appraiser in the Boston area appraised the property at 33 University 11 Road for the executors of the Herbert White Estate. Mr. Kinsella assumed that the highest *86 and best use of the property was as a manufacturing facility. Using an "income approach" to value the building, Kinsella valued it at $300,000. He valued the land at $0.75 per square foot. Mr. Lewis D. Humphrey, an expert in valuation and valuation techniques, made an appraisal of the property for the respondent. This appraisal was made in November 1972 looking at the value as of January 7, 1964, Mr. Humphrey utilized a "market residual" approach to value the property. This involved valuing the land on the basis of sale prices of comparable property. The residual value is then capitalized at a chosen rate. A comparable property chosen for review was located at 110 Mt. Auburn Street in Cambridge, Massachusetts. To reflect changes induced by the passage of time between the date of his examination and the valuation target date, Humphrey made certain percentage adjustments. This amounted to a 25-percent premium. To reflect the fact that the property chosen was approximately one-third the size of the 33 University Road property a 10-percent adjustment was made. A premium of five percent was accorded the 33 University Road property because of 12 its superior frontage. This *87 involved valuing the subject property at 30 percent more than the value of the comparable property. Depreciation Allowances Upon acquisition of 33 University Road, Offshore determined that the property had a useful life of 25 years. In its fiscal year ended October 31, 1965, Offshore again utilized a 25-year useful life in computing allowable depreciation. In 1966, Offshore reduced its estimate of the useful life of the building to 6 years. For the fiscal year 1967 the useful life was estimated at 40 months and in the 1968 fiscal year this was further adjusted to 36 months. By 1966 the 10-year lease on the property held by Baird-Atomic expired. Thereafter leases for 1-year terms were entered into. The adjustment in the useful life of the property resulted in corresponding increases in the depreciation deductions claimed by Offshore. Under a 25-year useful life the building had been depreciated by $4,320 per year. The various adjustments in useful life resulted in deductions of $38,611, $57,917 and $45,046 being taken for the fiscal years ended October 31, 1966, 1967 and 1968 respectively. 13 Baird-Atomic had made extensive modifications to the building to adapt *88 it to its purposes. When Baird-Atomic terminated its occupancy and moved to another location, Offshore attempted to lease the building. No other tenants were obtained. In other proceedings and for different purposes Offshore had, in 1965 and 1967, pledged the 33 University Road property to third parties as security. In 1969, when Offshore vacated the building, one of these security agreements was still in effect. Crows Nest IV For business purposes Offshore has owned a 52 foot oceangoing yacht since the 1950's. At various times Offshore has, under contract to various agencies of the United States Government acted as a target vessel as well as disposing of nuclear waste materials. The yacht has also been used for personal reasons by the Bairds. [1]
In the taxable year ended October 31, 1969, Offshore spent $19,288 for purposes related to the operation of the yacht. 14 During the years in question and at other times, the Bairds made extensive use of the yacht. During 1969 Dr. Baird paid to Offshore *89 $1,800 for his personal use of the yacht. This was occurred only during weekends. Dr. Baird made known the availability of the yacht for charter. No income from such charters was reported by Offshore. ULTIMATE FINDINGS 1. The value for depreciation purposes of the property located at 33 University Road was properly allocated by Offshore at $50,000 for the land and $250,000 for the building. 2. The useful life of the building decreased as the area surrounding the property evolved and Baird-Atomic made plans to relocate. 3. No abandonment loss for the building has been established by Offshore. 4. Petitioner Walter Baird received a constructive dividend of $1,800 from Offshore in the taxable year 1969, which represents the difference between the fair rental value ($3,600) and the amount ($1,800) he paid for the use of a company yacht. 15 OPINION 1. Valuation and Allocation. We must first determine a proper valuation for the three story mill-type building previously located at 33 University Road, Cambridge, Massachusetts. The building lot was some 51,000 square feet in area. The property was purchased by Dr. Baird for $300,000 in January 1964 pursuant *90 to the terms of an option granted him in May of 1955. At the time of the purchase $50,000 was allocated as the share of the purchase price attributable to the land and $250,000 was allocated to the building. A straight-line method of depreciation was then chosen with the useful life of the building estimated to be 25 years. Dr. Baird testified that his allocation was and is consistent with the regulations, specifically section 1.167(a)-5. He based his allocation on two premises: First, that his determination was consistent with the relative values placed on the land and building by the tax assessor of the City of Cambridge and, secondly, that $250,000 was consistent with his estimate of the value of the income the building was capable of generating. 16 Respondent argues that a proper allocation of the purchase price would be to value the land at $234,000 and the building at $66,000. [2]
Thus we are once again faced with the problem of valuing a piece of property *91 remote in point of time from its date of acquisition. There is no serious allegation that the original purchase was not a good faith, arm's-length transaction. Both parties agree that Offshore's basis in the property is $300,000 by virtue of the nature of the transaction in which Offshore acquired the property from Dr. Baird. Valuation and allocation disputes such as this necessarily depend upon their own particular facts and circumstances. The petitioner must overcome the presumption of correctness that attaches to the respondent's determination. We think Offshore has established the proper value and allocation as between the land and the building. Those factors influencing our decision to some extent 17 synergistically include Dr. Baird's familiarity with the area in which he bought the property. He went through this section of Cambridge daily for 25 to 30 years. He was intently interested in the well-being and growth of Baird Associates and then Baird-Atomic. He knew of the space needs of the business and was interested in seeing that they were met. By no means determinative, but nonetheless informative, was the value ascribed the land and the building by the *92 tax assessor of the City of Cambridge. In 2554-58 Creston Corp., 40 T.C. 932, 940 (1963), footnote 5, we pointed out that: Although valuations for real estate taxes may often be too low to be relied upon as furnishing the correct value of the particular parcel of real estate as a whole, we have no reason to reject the use of such valuations in determining the relative value of land and buildings.[Emphasis in original.] Offshore admits that the assessed value of the property does not equal the market value. But it points to the proportional allocation to land and building. [3] The laws 18 of the Commonwealth of Massachusetts prohibit variance in the tax rate between land and improvements. Thus, no advantage appears which would cause the City of Cambridge to allocate a proportionately higher or lower value to depreciable versus nondepreciable property. See Mass. Gen. L. Ch. 59 section 1 et seq.
*93 The utilization of assessed value as at least a guide in valuation is not totally unique in the tax law. Insurance settlements are considered but not treated as conclusive when attempting to determine the amount of an actual loss. [4]
Mr. Kinsella's appraisal of the property, which was done originally for the seller's estate, is also helpful. He actually viewed the property while it was still in use by petitioners. This does not negate the probative value of an assessment done later in point of time with respect to a certain data in the past. No useful purpose would be served herein by going over each method of appraisal or item of evidence. [5] 19 Suffice it to say that we have found as an ultimate fact and so hold that a value of $50,000 for the land and $250,000 for the building was reasonable when made. *94 2. Changes in Useful Life of Building. When originally acquired the building at 33 University Road was judged to have a 25-year useful life. By 1966, Offshore redetermined the building's useful life to be 6 years. It was further reduced to 40 months in 1967 and readjusted to 36 months in 1968. Prior to 1965, Offshore had claimed $18,333 in depreciation deductions for the building. In 1966, $38,611 was deducted. No explanation of the change in useful life was attached to its Federal income tax return. The fiscal year ended October 31, 1967, resulted in $57,917 being deducted as depreciation. At this time the building was said to have a 6-year useful life. The 1967 Federal income tax return states that the building's useful life had been reduced to 3 years "due to complete obsolescence by the end of the period." The 1968 Federal income tax return showed the building to have been abandoned. The statement attached to the return reads: 20 Building at 33 University Road, Cambridge, Mass. 02138, was abandoned in July 1969, because it had become obsolete and had become neither unsable to owner not to any other party. Loss as a result of this abandonment was computed as follows: *95 Cost of Building
250,000
Accumulated Depreciation
159,907
Loss-Abandoned Due to Obsolescence
90,093
Acknowledging that a useful life once chosen is not immutable, the respondent argues that neither is it chameleonlike. Useful life cannot be altered merely to attempt to recoup a decline in market value of a depreciable asset. The term estimated useful life of an asset is defined in section 1.167(a)-1(b), Income Tax Regs. It takes into account both the presently known conditions and reasonably foreseeable future developments. Redetermination of the useful life of an asset is permitted when there is a "clear and convincing basis" for doing so. Respondent urges that when the original useful life of 25 years was chosen Baird-Atomic knew at least two significant items that would affect the reasonableness of the figure chosen: First, that Baird-Atomic was seeking to relocate its plant and, secondly, that by late 1963 it was "obvious" that the property immediately 21 adjacent to 33 University Road was to become the Kennedy Memorial Library. This fact, plus the nonconforming use, should have made it clear to Dr. Baird and Offshore that a 25-year *96 useful life was incorrect. Even if the useful life of the building was not accurately gauged initially, there is a remedy available. Massey Motors v. nited States, 364 U.S. 92 (1960), recognizes that "the useful life of the asset [is] related to the period for which it may reasonably be expected to be employed in the taxpayer's business." The regulation provides that: In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change to a new and shorter estimated useful life computed in accordance with such showing will be permitted. [Regs. 1.167(a)-9; see also Regs. 1.167(a)-1]. This same regulation does not permit such a change solely on the unsupported opinion of the taxpayer. Relying on this regulation and Coors Porcelain Co., 52 T.C. 682 (1969), affirmed 429 F.2d 1 (C.A. 10, 1970), respondent argues that no adequate support exists for the belief that the building's useful life to Offshore was in any way reduced. Offshore has the burden of proving the incorrectness of respondent's *97 determination. Such proof may come from 22 one personally familiar with the asset over a long period of time. The weight to be given any evidence by such a party is a task given to the trier of the facts. See M. Pauline Casey, 38 T.C. 357, 381 (1962); Laura Massaglia, 33 T.C. 379, 388 (1959), affirmed 286 F.2d (C.A. 10, 1961). The proof necessary to show a change in the useful life of an asset should consist of facts known or reasonably anticipated at the end of the year in which the depreciation is claimed. Max Isenbergh, 31 T.C. 1046 (1959). Knowledge on the part of Offshore, through its operating officer, that Baird-Atomic was seeking larger and better quarters, that the 10-year lease was not to be renewed beyond a year at a time albeit at a higher rent, and the potential location of the Kennedy Memorial Library close to the manufacturing plant, are all factors affecting the useful life of the building. It is the useful economic life to Offshore that concerns us. Offshore knew of the increasingly difficult parking situation, the nonconforming use under the zoning laws, and the changing character of the neighborhood in which *98 the plant was located. From these and other factors the economic usefulness of the building to Offshore was redetermined. 23 The depreciation allowable in a given year msut be taken in that year and a depreciation charge may not be increased in a subsequent year so as to offset a failure in a prior year to take the proper amount of depreciation. Section 1.167(a)-10, Income Tax Regs. No "catch-up" is permitted under the regulations. However, adjustments are permitted and encouraged so that at least the actual depreciation is mirrored by the depreciation allowance claimed. Under these circumstances we conclude that the changes made in the estimated useful life of the building were proper. 3. Claimed Abandonment Loss on Building. For the fiscal year ended October 31, 1969, Offshore deducted as a loss its previously unrecovered basis in the building in the amount of $90,093. This claimed abandonment loss, deducted under section 165, is itself subject to the requirements of section 1.167(a)-8, Income Tax Regs. See Coors Porcelain Co., supra at 692. Section 1.167(a)-8(a) (4), Income Tax Regs., provides: Where an asset is retired by actual physical abandonment *99 * * * loss will be recognized measured by the amount of the adjusted basis of the asset abandoned at the time of such abandonment. In order to qualify for the recognition of loss from physical abandonment, 24 the intent of the taxpayer must be irrevocably to discard the asset so that it will neither be used again by him nor retrieved by him for sale, exchange, or other disposition. Respondent contends that Offshore is seeking an unallowable deduction for the declining market value of the building. He argues that no abandonment loss is allowable because the building was not abandoned in the sense of the regulation. Primary reliance is placed on United California Bank, 41 T.C. 437 (1964), affirmed per curiam 340 F.2d 320 (C.A. 9, 1965). Offshore sets forth the correct basic rules that for there to be an abandonment loss there must exist an intent to abandon the property as well as an identifiable act of abandonment. Although it is not essential that legal title to the property be lost, mere nonuse of the property does not constitute abandonment. *100 Ford v. United States, 20 A.F.T.R.2d 5033 (W.D. Ky. 1967), affirrmed per curiam 402 F.2d 791 ((C.A. 6, 1968), without discussion of the abandonment issue; United California Bank, supra at 451. Demolition of the abandoned property is not required to justify the deduction. See Hummel v. United States, 227 F. Supp. 30 (N.D. Cal. 1963); Minneapolis, St. Paul & Saulte Ste. Marie Ry. Co. v. Commissioner, 34 B.T.A. 177, 185 (1936). 25 There is no abandonment when property is sold or if compensation is received for the property allegedly abandoned. S.S. White Dental Mfg. Co. v. United States, 55 F. Supp. 117 (Ct. Cl. 1944), involved the allowance of an abandonment loss in spite of the fact that within 2 months of such abandonment the property was sold. That case, however, was decided prior to the inclusion of the language in section 1.167(a)-8(a) (4), Income Tax Regs., which expressly denies recognition of an abandonment loss unless the taxpayer abandons property so that it "will neither be used again * * * nor retrieved by him for sale, exchange, or other disposition." *101 Tanforan Co. v. United States, 313 F. Supp. 796, 806 (N.D. Cal. 1970), affirmed per curian 462 F.2d 605 (C.A. 9, 1972). [6]
The building here involved was in use until at least September 30, 1969. After Baird-Atomic moved to other quarters, Offshore listed the property for rent with a large Boston real estate agent. Efforts to rent the building proved unsuccessful. 26 The property at 33 University Road was subject to two security instruments designed to protect Baird-Atomic from liability in a stockholder derivative suit. On November 13, 1969, the board of directors of Baird-Atomic granted the Cambridge Plaza Trust the right of first refusal to buy the land and building. The building contained a large amount of equipment belonging to Baird-Atomic following the move. From this fact the respondent contends that United California Bank, supra, where two bank vaults were stored during negotiations for sale of the building, is controlling. In that case we held that no abandonment had occurred. *102 The finding that no redetermination of useful life was made in the United California Bank case does not speak to the point as to whether the building was held for sale while ostensibly abandoned. That both cases resulted ultimately in the buildings being demolished is not determinative of the abandonment issue for the year such loss was taken. Just as obsolescence in a given taxable year cannot be determined on the basis of later events neither may abandonment.See Coors Porcelain Co., supra at 694. Where the building was sold together with the land it occupied it is not reasonable to assume that the building was abandoned. The building could have been 27 "retrieved" and to a certain extent it was so retrieved when sold. Had the building not been sold along with the land its ownership would have been in doubt. Offshore raised exactly this question in discussing the security interests held against the building. The answer indicates that ownership was not relinquished and that nonuse for the short period between the move by Baird-Atomic and the subsequent sale does not adequately establish abandonment. *103 It is plain that what Offshore seeks is an unallowable deduction for the reclining market value of the building. This Court has stated that "Declining values due to economic conditions will not support a claim for obsolescence." James D. Dunn, 42 T.C. 490, 494 (1964). Moreover, Offshore has failed to show that the building's usefulness suddenly terminated in the fiscal year ended October 31, 1969, and that the building was physically abandoned never to be retrieved for "sale, exchange, or other disposition." Section 1.167(a)-8(a) (4), Income Tax Regs. Accordingly, we hold that Offshore is not entitled to the claimed abandonment loss. 4. Yacht Expenses. During the fiscal year ended October 31, 1969, Offshore deducted $26,902 as business expenses. Of this amount, $19,288 (including an allowance 28 of $4,260 for depreciation) was attributable to the operation of the yacht, Crows Nest IV. During this opening statement counsel for Offshore stated that $13,255 of the disallowed amount ($19,288) was still at issue. Respondent's position is that, regardless of the amount presently contested, the petitioner has failed to overcome the presumption of correctness supporting *104 the respondent's determination. Respondent further asserts that the expenses were not ordinary and necessary and were not in fact incurred for the purpose of making a profit, but were incurred solely for the personal benefit of Dr. Baird, the sole shareholder of Offshore, and as such constitute income to him. Petitioner Walter Baird argues that the yacht expenses were the ordinary and necessary expenses of Offshore and as such are fully deductible by Offshore. Furthermore, he claims that he paid the going rate to Offshore for the use of the yacht. It is the measure of the Income to Dr. Baird that is in dispute here, and not the broader principle that a shareholder is considered to have received taxable income when he receives a benefit from his corporation. 29 It is not enough to find that a dividend has been paid or provided and received. The measure of such dividend is the more difficult question. See Nicholls, North, Buse Co., 56 T.C. 1225, 1240 (1971), where this Court pointed out that: Two standards have been used on different occasions, the first being the initial cost of the facility and the second, the approximate rental value for the period at *105 issue. Where corporate ownership is clear the use of the first standard has not been made. See Louis Greenspon, 23 T.C. 138 (1954), modified 229 F.2d 947 (C.A. 8, 1956). Here it is not alleged that the yacht was not owned by Offshore. Use of the second standard, namely the fair rental value, presents the problem of determining that value. Dr. Baird used the yacht on most weekends during the summer of 1969. He paid Offshore $1,800 computed at $600 per week for such use. The difficulty with this approach is that the yacht was readily available to him at all times during that summer. No other income was received for the use of the yacht. We do not know whether this was because of a weak market during 1969 or the fact that Dr. Baird used the yacht during the 30 weekends, thus limiting the rental period to the weekdays. In Nicholls, North, Buse Co., supra at 1241, we decided that rental value "should not be computed only for days of recorded use since we have held that the boat was freely available for personal use * * *." The value of this "standby" status should necessarily be added to the benefit received. It is this amount that *106 constitutes additional income to Dr. Baird. Where, as here, no other income was received from charters or for any other use of the yacht, the evidence strongly points to preference having been given to Dr. Baird's seafaring instincts rather than a desire by Offshore to make a profit. This being so, we conclude that the "fair" rental for the yacht was $3,600.The difference between $3,600 and the amount paid ($1,800) by Dr. Baird constitutes a constructive dividend to him in 1969. To reflect the concessions made by the parties and our conclusions with respect to the disputed issues, Decisions will be entered under Rule 50. Footnotes
1. The disallowance of the yacht expenditures made by Offshore for the taxable years ended October 31, 1966, 1967, 1968 and 1969 have been conceded by the petitioners. ↩
2. These figures differ from those contained in the statutory notice of deficiency. At that time respondent determined that the basis allocation should be $192,000 to the land and $108,000 to the building. ↩
3. Obviously the assessed value does not equal the fair market value either.Municipal assessments are frequently made at a fraction of the real value with the possible revenue shortfall being covered by adjusting the tax rate. Adjusting the rate while undervaluing the base is at least a superficial palliative. ↩
4. See Richard R. Hollington, 15 T.C.M. 668, 671 (1956); Bruce B. Steinmann, T.C. Memo. 1971-295 (county appraisal ratio of values accepted); Jack R. Farber, 57 T.C. 714, 718↩ (1972), pointed out again the usefulness of this type of information in aiding this Court to arrive at a proper figure. 5. The petitioners' brief was, with respect to this issue of the case, very helpful. ↩
6. See W E G Dial Telephone inc., T.C. Memo. 1966-41↩, denying an abandonment loss where the property was subsequently sold.